THE RELIEF.

THE ALEXANDER ELDER.

EDWARDS v. THE ALEXANDER ELDER.

(*District Court, D. Maryland.* July 2, 1892.)

1. SALVAGE—PILOT BOAT—PUBLIC POLICY—COMPENSATION.
    The British steamship Alexander Elder, worth $225,000, with cargo and freight worth as much more, went ashore near Cape Henry light, while in charge of a Maryland pilot, under circumstances which indicated that it was the fault of the pilot. The Virginia steam pilot boat Relief, which was attending to take off the pilot, rendered salvage service in pulling the steamship afloat. *Held*, that it was

against public policy that a liberal salvage award should be allowed a pilot boat under such circumstances.

2. SAME—COMPENSATION.

    *Held*, under the circumstances of the expensive litigation in this case, that $1,000 should be allowed, although a prompt tender of considerably less would have been held sufficient.

(*Syllabus by the Court.*)

In Admiralty. Libel for salvage. Decree for libelants.

*Charles Marshall* and *R. C. Marshall*, for libelants.

*Brown & Brune*, for the Alexander Elder.

MORRIS, District Judge. This is a libel by the Virginia Pilot Association, who own the steam pilot boat Relief, to recover for salvage service to the British steamship Alexander Elder in pulling her off the ground just under Cape Henry light, on the 13th of May, 1891. The Alexander Elder is a large steel screw steamer, 4,173 tons gross register, over 300 feet in length, and worth about $225,000. She had on board a cargo of 500 live cattle, and general merchandise, in value probably nearly equal to the value of the ship, and her freight for the voyage was $12,500. She drew 23 feet 7 inches forward and 23 feet 10 inches aft. She left Baltimore on the 12th of May, 1891, on a voyage to Liverpool, in charge of a Maryland pilot. About midnight, when the pilot supposed the steamer was near the tail of the Horseshoe, in the mouth of the Chesapeake bay, he signaled to the pilot boat, which was lying outside the capes, to be ready to take him off, and received a proper answering signal. The pilot then ordered the wheelsman of the steamship to steer for the pilot boat. The pilot boat came in from the sea towards the steamship, and presently came up to her on her port side; but the pilot, not intending to leave the steamship until he had taken her outside the capes and clear of the red sector of Cape Henry light, continued on and ordered the steamship to be steered S. E. by E. He kept that course for about two miles, until he was on the ocean side of Cape Henry, and just outside of the red sector, the Relief following astern of the steamship. The steamship's engines were then slowed and stopped in order to put off the pilot, and the pilot had left the bridge when the master said he thought he felt the steamship touch the ground. The pilot was called back to the bridge, and it was discovered that the steamship was aground. Subsequent soundings disclosed that her bow had run upon the sand for about 100 feet, and that she had about four feet less water under her than she drew for about 100 feet from her bow, the rest of her length being in water sufficient to float her. Efforts were made to get her off by putting her engines at full speed astern, by pumping out 110 tons of water ballast and by putting out an anchor, but she did not come off. The Relief had met the steamship and passed her on her port side and had come around under her stern and followed along on the steamship's starboard quarter between her and the shore. Her speed was not quite equal to the steamship's, and she fell somewhat astern, but when the steamship grounded those in charge of the Relief noticed that they were running up on her, and that they were near the

land, and, throwing the lead, found only from three to four fathoms. They then reversed her engines to prevent going ashore themselves or colliding with the steamship. After awhile they heard whistles from the steamship, and sent one of the Virginia pilots aboard the steamship. The master asked for assistance. The representative of the Relief said they would pull on the steamship for $500, with the understanding that they should be paid $2,500 if they pulled the steamship off. The master declined this proposition as exorbitant, and contended that, as the pilot in charge of the steamship had put her ashore, the pilot boat ought to be willing to help her off. Afterwards the captain in charge of the Relief came aboard the steamship and talked the matter over with her master, making the same proposition, but with the same result. The master of the steamship declined assistance on the terms offered. He said he had no authority to make such an agreement, and that at daylight he would communicate with the steamship's agents in Baltimore, and let them take the responsibility. The captain of the Relief left, saying he would not return until signaled for. At about 6 o'clock in the morning, however, the master of the steamship did signal to the Relief, which was near by on her station. The Relief came up to within about 40 or 50 feet, and with the aid of her yawl boat took a six-inch hawser from the steamer. She had hardly got her full power on it when it parted. A steamer was then seen coming in from sea, requiring a pilot, and some one from the Relief went aboard the steamship and told the master that the Relief would go off and put a pilot on the incoming steamer, and return in about an hour. While the Relief was away on this errand, and was not hurrying back, as the men on her wanted an opportunity to get breakfast, the steamship again signaled, and the Relief again returned. This time a new nine-inch hawser had been gotten out on board the steamship, and was passed, with the aid of the Relief's yawl boat, on board of her. Then the Relief applied her full power, the steamship's engines were worked full speed astern, and the steamship started at once, and came off the bank into deep water. The master then gave to the Relief the following certificate, addressed to the steamship's agents at Baltimore.

"STEAMSHIP ALEXANDER ELDER, OFF CAPE HENRY, 13th May, 1891.

"This is to certify that the Virginia pilot boat Relief gave us a pluck off the ground at 8 A. M. to-day. No agreement made.

"N. BANNATYNE, Master."

The steamship was uninjured and proceeded on her voyage.

The night when the steamship went aground was dark and rainy, with moderate wind from the northeast, and moderate sea. There was no fog, and no difficulty in seeing lights. Up to 8 o'clock in the morning, when the steamship came off, the wind and sea continued moderate, the wind being about 12 or 13 miles an hour, but the indications were threatening, and during that day the wind and sea gradually increased until 10 o'clock that night.

The way in which it happened that the Virginia steam pilot boat Relief was attending to taking off the Maryland pilot from the steamship

was this: Each association has one steam pilot boat, and about once a month one or the other of these two steamers goes off duty for a short time to refit. During that interval, by agreement between the members of the two associations, the remaining boat attends both sets of pilots. On this occasion the Maryland boat was off duty, and there were on board the Relief a number of pilots of both associations, and she was doing the work of both boats.

The Relief is a new iron screw steamer, 125 feet long, with engines capable of developing 800 horse power, and she cost about $50,000. She was built for a pilot boat, and also to tow and assist vessels in distress, and is fitted out for that purpose.

It must be conceded that the service in this case was salvage service. The steamship was in a situation of danger, requiring assistance. It is true she went aground when her speed was almost stopped, and she slid upon the sand so gently as to be hardly noticeable, but her momentum was very great, and bedded her for one third of her length in the sand, so that all her own efforts to get off were unavailing. There is every reason to believe that unassisted she would not have gotten off without jettison of part of her cargo, and, as long as she remained aground in the very exposed condition in which she lay, she was subject to great risk of injury. It is shown that effective assistance would probably have reached her about 4 hours later from Norfolk, and about 16 hours later from Baltimore, but these delays would have been hazardous. But, notwithstanding the timely and effective assistance rendered by the pilot boat Relief, there are circumstances in the case which reduce the service to the lowest grade of salvage compensation, and, indeed, there are some facts in the case which have caused me to hesitate as to whether in strictness there should be any recovery. The pilots of Maryland and Virginia exercise under the laws of their respective states a very valuable public franchise. They are granted a monopoly, and their compensation is liberal. All vessels except those in the coasting trade must pay them full pilotage, whether they employ them or not. The attendance of a pilot boat to put pilots aboard incoming and take them off outgoing vessels is a necessity of their business, and is required by law. When a pilot, through unskillfulness, puts a vessel which has employed him in a situation of distress, it would be grossly inequitable that the attending pilot boat of the association of which he is a member, and through which he gets his license, should profit by his want of skill. It would be contrary to the rule which denies to persons who have contributed to place property in danger any reward for rescuing it from the consequences of their own wrongful act. *The Clarita and The Clara*, 23 Wall. 1. In the present case there is much reason to conclude that it was want of skill or inattention on the part of the pilot in charge of the steamship which put her ashore. On an ordinarily dark night, with all the beacon lights visible, he was a mile and a half out of his course, and ran the steamship ashore not half a mile from the beach, and less than a mile from Cape Henry lighthouse. He gives no explanation which satisfactorily exculpates him, considering the high degree

of skill and attention reasonably demanded of one who undertakes to exercise his privileged occupation. It is true that the pilot boat Relief did not belong to the Association of Maryland Pilots, of which he was a member; but for the time, by the mutual agreement before mentioned, she was acting in the place of the Maryland boat. It may be said that she was under no legal duty to render assistance; and while, for this reason, she may not be so affected by her connection with the Maryland pilot in charge of the steamship as to bar her recovery,—considering how important it is that assistance shall be rendered to vessels in distress, and how highly favored in admiralty is the right of salvage,—yet she is so affected by the equities of her relationship to the pilot that it must properly influence the amount of the reward.

In considering the service itself, there is but one element which suggests a liberal compensation; that is, the large value of the steamship and cargo, and the importance of the service to her. In other respects there is wanting all the elements which suggest liberal awards. The Relief did not go out to seek the vessel in distress, taking the risk of finding her. She was alongside, almost participating in her going ashore, and she remained near at hand because she was on her station. She did not give up or interrupt her ordinary employment, but came and went, attending to putting pilots on incoming vessels. She lost no appreciable time in the service itself, and incurred no risks other than the ordinary risks of navigation and towage. It is true she is a powerful steamer, much more so than is required for her duties as a pilot boat, and no doubt it is a benefit to commerce that she should be maintained, and be able to give effective assistance to vessels in distress; but it should be remembered in this class of cases that she is an instrumentality of the system of pilots established and encouraged and protected by the state laws for the assistance and safety of foreign vessels. The business of these pilots is to prevent such vessels getting ashore by offering to them timely and skillful guidance in their navigation; and public policy requires that the pecuniary reward which they may derive by rescuing vessels from disasters which it is their special business to prevent, should, in ordinary cases, be very moderate. In this case I award $1,000. If a prompt tender had been made of a considerably less sum by the owners of the steamship, I should have approved of it as sufficient; but the manner in which the parties have dealt with each other has led to a troublesome litigation, which these libelants have been obliged to conduct at a distance from their homes, and which has involved them in considerable expense.